UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| AFRODITA ASANACHESCU, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>CLARK COUNTY, et al.,<br><br>　　　　　Defendants. | CASE NO. C13-5222 BHS<br><br>ORDER GRANTING DEFENDANT NEAL RENDLEMAN'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CLAIMS WITHOUT PREJUDICE |

　　　This matter comes before the Court on Defendant Neal Rendleman, MD's ("Dr. Rendleman") Motion for Judgment on the Pleadings. Dkt. 48. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

**I. PROCEDURAL HISTORY**

　　　On March 25, 2013, Plaintiffs filed a complaint naming Dr. Rendleman and others as defendants in an action involving conduct that led to the death of a mentally ill pretrial detainee, Marius Asanachescu ("Asanachescu"). Dkt. 1. On July 2, 2013, Dr. Rendleman filed an answer. Dkt. 26. On August 21, 2013, Dr. Rendleman filed a Motion

ORDER - 1

for Judgment on the Pleadings. Dkt. 48. On September 9, 2013, Plaintiffs filed a response (Dkt. 57) and on September 13, 2013, Dr. Rendleman filed a reply (Dkt. 60).

## II. FACTUAL BACKGROUND[1]

In their complaint, Plaintiffs allege that Defendants were deliberately indifferent to the medical needs of Asanachescu while he was a pretrial detainee at the Clark County Jail, and that Defendants' acts and omissions culminated in Asanachescu's death. Dkt. 1.

According to the complaint, Dr. Rendleman worked for Conmed, Inc.[2] and was the "prescribing designee" for the jail. Dkt. 1 at 7. His duties included "evaluating requests for psychiatric service and determining the need for immediate treatment." Dkt. 1 at 7.

On January 30, 2012, Asanachescu was booked at the Clark County Jail on an assault charge. Dkt. 1 at 9. Asanachescu suffered from Schizoaffective Disorder, Bipolar Type, a mental illness which had caused him to pose a risk to himself and others in the past. Dkt. 1 at 3. Plaintiffs allege that Asanachescu's mental illness had been well compensated in recent years, and that Clozaril, a medication he had been prescribed prior to his booking, proved effective in treating his illness. Dkt. 1 at 3. Plaintiffs allege that Asanachescu was never provided this medication while at the jail.

After booking, Asanachescu was placed in administrative segregation "as a safety and security risk." Dkt. 1 at 9. The jail informed Asanachescu that his placement was

---

[1] This background is taken from Plaintiffs' complaint, as the Court, in deciding a Rule 12(c) motion brought by a defendant, accepts the allegations contained in the complaint as true.
[2] Conmed contracted with Clark County Jail to provide medical and health care services. Dkt. 1 at 5.

necessary because he posed a danger to himself and others. Dkt. 1 at 9.   The booking officer noted that Asanachescu had attempted suicide in the past and that he was "bi polor [sic] off meds." Dkt. 1 at 9.

On February 2, 2012, Asanachescu was placed on suicide watch after informing an officer that he was suicidal. Dkt. 1 at 11-12.  Later that day, Asanachescu was observed "naked and lying face down on the floor of the cell pounding his forehead on the steel drain cover."  Dkt. 1 at 12.  Asanachescu's self-harming behavior continued over the next few days and at times jail staff restrained him by strapping him in a "Pro-Straint chair." Dkt. 1 at 16.

On February 7, 2012, after another episode of self-harm behavior, Defendant James Douglas, MD ("Dr. Douglas"), ordered administration of the drug olanzapine as a "bridge" until Clozaril could be obtained.  Dkt. 1 at 18.  Dr. Douglas noted that Asanachescu had been "extremely violent and self injurious since incarceration" and that he "historically decompensated when meds other than Clozaril are tried." Dkt. 1 at 18. On the afternoon of February 7, 2012, Asanachescu received the olanzapine injection. Dkt. 1 at 19. That evening and the following afternoon, however, Asanachescu refused to voluntarily take the olanzapine and it was not administered. Dkt. 1 at 19.

On the night of February 8, 2012, Asanachescu again began banging his head in his cell and refused to stop.  Dkt. 1 at 20.  Asanachescu agreed to be placed into the Pro-Straint chair, and at 11:35 p.m., Registered Nurse Kelle Price ("RN Price") was called for "placement of inmate in restraint chair." Dkt. 1 at 20. When she arrived, RN Price noted that Asanachescu was "disheaveled [sic], naked, covered in feces and blood, was

observed slamming frontal forehead on floor, unable assess orientation…." Dkt. 1 at 20. RN Price checked his vital signs and noted he had a "risk for confusion" from slamming his head on the floor and "risk for injury [related to] self destructive behavior." Dkt. 1 at 20.

In the early hours of February 9, 2012, Asanachescu allegedly became assaultive toward jail staff. Dkt. 1 at 21. His behavior evidently became serious enough that a sergeant contacted RN Price "regarding Asanachescu's aggressive and self-harm behavior, requesting RN Price contact a qualified mental health professional for evaluation and possible emergency psychotropic medication administration…." Dkt. 1 at 21.  That morning, Asanachescu continued to refuse taking the olanzapine voluntarily. Dkt. 1 at 22.  Asanachescu was placed in the Pro-Straint chair for seven hours.  At 6:00 pm, jail staff continued to restrain Asanachescu because he was "struggling against restraints, demanding to be removed" and was exhibiting "violent, erratic behavior." Dkt. 1 at 25.

Dr. Rendleman was allegedly the on-call physician for the jail on February 9, 2012.  At 6:30 pm, RN Price contacted Dr. Rendleman to confer regarding Asanachescu's "evident need for psychiatric care." Dkt. 1 at 25.  Dr. Rendleman informed RN Price that Asanachescu was not his patient and to wait until the next day for Asanachescu's assigned doctor, Dr. Douglas, to examine him. Dkt. 1 at 25.  According to the complaint, Dr. Rendleman "offered no treatment plan other than to follow Dr. Douglas' order for olanzapine, which Asanachescu had refused to take for the last two days." Dkt. 1 at 25-26.

1    After the call with Dr. Rendleman, jail staff continued to restrain Asanachescu in
2  the Pro-Straint chair.  After he had been strapped in the chair for 9.5 hours, Sgt. Tangen
3  drafted a "written action plan" justifying continued restraint.  Dkt. 1 at 27-28.  In the
4  action plan, Sgt. Tangen stated that he contacted RN Price, who called Dr. Rendleman.
5  Dkt. 1 at 27-28.  Sgt. Tangen's understanding of the call was that Dr. Rendleman
6  indicated that Asanachescu was not his patient and that Dr. Rendleman referred the case
7  to the "other MH doctor"—meaning Dr. Douglas—who was "not on call and doesn't take
8  calls." Dkt. 1 at 26-27. A summary later written in an email by CCSO Commander
9  Richard Bishop, indicated that Dr. Rendleman instructed RN Price that Asanachescu was
10 not his patient, and to call Dr. Douglas.  Dkt. 1 at 27-28.  Commander Bishop indicated
11 that Dr. Douglas was not on call at the time and was not answering his phone or
12 messages. Dkt. 1 at 27-28.   Sgt. Tangen concluded that "continued restraint is necessary
13 to prevent injury to staff and inmate." Dkt. 1 at 27.
14    At 8:50 pm on February 9, 2012, Asanachescu accepted olanzapine.  Dkt. 1 at 27.
15 By 10:15 pm, jail staff released Asanachescu from his chair after "eleven hours of
16 struggling against his restraints…." Dkt. 1 at 27.
17    On the morning of February 10, 2012, Asanachescu did not want to take his
18 medications and was again observed banging his head on the floor. Dkt. 1 at 30.  When
19 Asanachescu refused orders to stop banging his head on the floor, a number of custody
20 officers gathered outside his cell. Dkt. 1 at 30.  The officers fired several Taser rounds at
21 Asanachescu and entered his cell.  Dkt. 1 at 30.  One of the officers took Asanachescu
22 down to the ground, and other officers assisted in restraining Asanachescu. Dkt. 1 at 30-

31. According to the complaint, Asanachescu was unable to breathe but could not communicate this to the officers "because of his mental illness." Dkt. 1 at 31. Asanachescu died during this encounter at approximately 8:50 am. Dkt. 1 at 31. The complaint alleges that the Clark County Medical Examiner ruled the death a "homicide" and that the cause of death was "asphyxiation due to chest compression and psychosis – the former from the pressure exerted by custody officers, and the latter from Asanachescu's inability to communicate he could not breathe." Dkt. 1 at 31.

## III. DISCUSSION

Plaintiffs allege the following causes of action against Dr. Rendleman: (1) unreasonable denial of mental health care in violation of the 14th Amendment, (2) punishment of a detainee in violation of the 14th Amendment, (3) unreasonable conduct and/or conduct so arbitrary that it shocks the conscience in violation of the 14th Amendment, and (4) deprivation of equal protection rights in violation of the 14th Amendment. Dkt. 1 at 38-44.[3] Dr. Rendleman argues that none of Plaintiffs' claims against him meet the 12(c) standard and thus all claims should be dismissed. Dkts. 48 and 60.

---

[3] In his reply, Dr. Rendleman asks the Court to affirm that Plaintiffs' excessive force complaint does not name him. Dr. Rendleman is not listed as a defendant with respect to this claim, and Plaintiffs have not argued otherwise. *See* Dkt. 1 at 37-38 (maintaining an excessive force cause of action which does not identify Dr. Rendleman). The Court concludes that Plaintiffs are not maintaining such a claim against Dr. Rendleman.

A.   **Legal Standard for 12(c) Motion**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  After the defendant has answered the complaint, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is essentially the same as that applied to a Rule 12(b)(6) motion. "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990).  When analyzing a Rule 12(c) motion, the allegations made by the non-moving party are considered true. *Id*.

To survive a Rule 12(c) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citation omitted).  This requires that the complaint plead facts which allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.  *Id*.  Dismissal with prejudice and without leave to amend is not appropriate, unless it is clear that the complaint could not be saved by amendment.  *Harris v. County of Orange*, 682 F.3d 1126,1131 (9th Cir. 2012) (*citing Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003) (per curiam)).

B.   **Plaintiffs' Claim For Unreasonable Denial Of Mental Health Care**

Plaintiffs allege that Dr. Rendleman was indifferent to Asanachescu's medical needs by failing to (1) review his mental health history and/or evaluate him in person, (2)

provide a treatment plan regarding Asanachescu's critical and immediate mental health needs, (3) contact a psychiatrist to provide him an immediate psychiatric evaluation, (4) arrange for emergency psychiatric medication and/or hospitalization, and (5) justify Asanachescu's continued restraint in the Pro-Straint chair. Dkt. 1 at 26.

Because Mr. Asanachescu was a pretrial detainee, Plaintiffs' claim for unreasonable denial of mental health care is evaluated under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). However, because "pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment…we apply the same standards." *Id.*; *see also Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241-44 (9th Cir. 2010).

At the pleading stage, this standard requires a plaintiff to "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Thus, the complaint must plead facts that establish the existence of a "serious medical need," and deliberate indifference on the part of the defendant. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

To establish a "serious medical need," the plaintiff must plead facts which show that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.*

To establish deliberate indifference, the plaintiff must plead facts which show that the defendant engaged in a purposeful act or omission to respond to a serious medical

need and that harm resulted from the indifference. In *Jett*, the Ninth Circuit explained what is meant by "deliberate indifference":

> Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Yet, an "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs. If the harm is an "isolated exception" to the defendant's "overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference."

*Id.* at 1096 (citations omitted).

Here, Plaintiffs have pled sufficient facts to establish the existence of a serious medical need. Plaintiffs allege that Asanachescu suffered from a serious mental illness and that the county medical examiner deemed his mental illness a contributing factor in causing his death.

Plaintiffs have alleged facts which suggest that on February 9, 2012, Asanachescu's mental condition had become serious enough that both RN Price and custody staff felt it was necessary to contact Dr. Rendleman, who was the on-call physician at the time. At this point in time, Asanachescu had still not received the medication which Plaintiffs allege was necessary to address his symptoms of aggression and self-harm. Custody staff had been restraining him in the Pro-Straint chair for hours in an attempt to prevent Asanachescu from engaging in continued self-harm or in assaulting staff. According to emails documented in the complaint, custody staff appeared to express frustration with Dr. Rendleman's response, which was to defer to Dr. Douglas, who could not be reached at the time.

1     Dr. Rendleman argues that the claims against him should be dismissed because

2 there are no plausible facts which could establish that his decision to defer to Dr.

3 Douglas's prior prescription resulted in any tangible injury.

4     The Court finds that Plaintiffs have not pled sufficient facts to meet their burden of

5 establishing that Dr. Rendleman's actions or inactions caused Asanachescu additional

6 suffering and/or contributed to his death. Plaintiffs fail to allege facts showing what was

7 conveyed to Dr. Rendleman during RN Price's call to him about Asanachescu's allegedly

8 extreme state, such as what particular symptoms and conduct precipitated the call.

9 Absent additional factual allegations beyond Dr. Rendleman's deferral to Dr. Douglas

10 and his prior prescription and without an alleged second call to Dr. Rendleman, *for

11 example*, indicating that Dr. Douglas could not be reached and explaining Asanachescu's

12 response to the dosage of olanzapine[4], the Court finds that the Plaintiffs have not met the

13 standard for pleading deliberate indifference.

14     However, because the Court cannot say as a matter of law that amendment of the

15 pleading would be futile, dismissal of Plaintiffs' deliberate indifference claim is without

16 prejudice.

---

[4] Indeed, the alleged facts reveal that after the phone call with Dr. Rendlemen on February 9, 2012 at 6:30 pm (Dkt. 1 at 25), Asanachescu voluntarily took his medication, which apparently calmed him enough to allow removal of the restraints. *Id.* at 27. Then, another physician was called at 11:00 pm, and he prescribed 1-2 mg of Ativan for Anasachescu every three hours "while in agitated state." *Id.* at 28. This series of events raises further questions about what, if any, impact Dr. Rendleman's conduct has on causation.

### C. Plaintiffs' Claim For Unlawful Punishment Of A Pretrial Detainee

Plaintiffs' claim for unlawful punishment appears redundant of their claim for unreasonable denial of medical care. *See Clothier*, 591 F.3d at 1242-43 ("[b]ecause pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment ... we apply the same standards.") (*quoting Frost*, 152 F.3d at 1128).

For the same reasons the Court found Plaintiffs' have not pled fact sufficient to support a deliberate indifference claim, it also finds that Plaintiffs have not pled sufficient facts to support a claim for unlawful punishment of a pretrial detainee. This claim is dismissed without prejudice, as the Court cannot find as a matter of law that amendment of the complaint would be futile.

### D. Plaintiffs' Claim On Behalf Of Parents For Conduct That Shocks The Conscience

Parents have a Fourteenth Amendment right in the companionship of their children. *Curnow ex. rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). The standard for analyzing this claim, however, is "quite demanding," and is only met where alleged conduct "shocks the conscience" and "violates the decencies of civilized conduct." *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir.) (citations omitted).

The facts pled by Plaintiffs do not meet the standards set forth above. The present allegations regarding Dr. Rendleman's deferral to Dr. Douglas's prescription do not rise to the level necessary to show that his actions "shock the conscience" and "violate the decencies of a civilized conduct." *Stoot,* 582 F.3d at 928. As it did with respect to the

1  foregoing claims, the Court dismisses this claim without prejudice because it cannot find
2  as a matter of law that amendment of the complaint would be futile.

3  **E.     Plaintiffs' Claim For Deprivation Of Equal Protection Rights**

4  Plaintiffs allege that Dr. Rendleman "discriminated against or caused the
5  discrimination against Asanachescu because he was mentally ill, in violation of the
6  Fourteenth Amendment." Dkt. 1 at 43.

7  To establish this claim, Plaintiffs are required to show that Dr. Rendleman
8  discriminated against Mr. Asanachescu as a member of an identifiable class and that the
9  discrimination was intentional. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130,
10 1134 (9th Cir.).   The parties do not appear to dispute that Asanachescu was in a protected
11 class because of his mental illness.

12 Plaintiffs claim that the complaint supports a finding of discriminatory intent
13 because Dr. Rendleman failed to follow certain Conmed policies when he consulted with
14 RN Price. Dkt. 57 at 22. They also claim that discriminatory intent is evidenced by the
15 fact that Dr. Rendleman allowed Mr. Asanaschescu to be restrained in the Pro-Straint
16 chair for an extended period of time and that he should have personally examined him.

17 Finally, Plaintiffs point to the initial disclosures filed by Dr. Rendleman and other
18 defendants in which a report produced by Conmed apparently recommended that Dr.
19 Rendleman personally meet with mental health patients rather than "just take them off
20 their meds." Dkt. 29 at 90.  This document was not referenced in the complaint.  The
21 Court cannot properly consider this document without converting the motion into a
22

1 summary judgment motion and giving Dr. Rendleman an opportunity to respond. *Lee v.
2 City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

3 The Court concludes that Plaintiffs have not pled facts sufficient to meet the standards set forth above, which require a showing of intentional discrimination on the part of Dr. Rendleman. Plaintiffs' claim for equal protection is dismissed without prejudice because the Court cannot find as a matter of law that it would be futile to permit amendment of the complaint.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Dr. Rendleman's's motion for judgment on the pleadings (Dkt. 48) is **GRANTED** and the claims against him are **dismissed without prejudice**. Plaintiffs may file an amended complaint with respect to the foregoing claims against Dr. Rendleman no later than December 20, 2013.

Dated this 10th day of December, 2013.

BENJAMIN H. SETTLE
United States District Judge